**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 22-6410**

───────────

DAVID T. KING, individually and as Personal Representative of the Estate of John Telly King,

Plaintiff - Appellant,

v.

WARDEN TIMOTHY RILEY; ASSOCIATE WARDEN ANDREA THOMPSON; ASSOCIATE WARDEN GARY LANE; MAJOR V. JACKSON; CAPTAIN YOLANDA BROWN; LT. TRAVIS PRESSLEY; SGT. DEWAUN MCKAN; CPL. MATTHEW WHITAKER; and C/O DAMIAN JONES,

Defendants - Appellees.

───────────

Appeal from the United States District Court for the District of South Carolina, at Rock Hill.  Paige Jones Gossett, Magistrate Judge.  (0:19-cv-00828-PJG)

───────────

Argued:  January 27, 2023                    Decided:  August 4, 2023

───────────

Before WYNN, THACKER, and RICHARDSON, Circuit Judges.

───────────

Affirmed by published opinion.  Judge Richardson wrote the opinion, in which Judge Thacker joined.  Judge Wynn wrote an opinion dissenting.

───────────

**ARGUED:**  Elizabeth Anne Franklin-Best, ELIZABETH FRANKLIN-BEST, P.C., Columbia, South Carolina, for Appellant.  Claude Eugene Hardin, Jr., THE MCKAY FIRM, P.A., Columbia, South Carolina; Daniel C. Plyler, SMITH ROBINSON, LLC, Columbia, South Carolina; David Allan DeMasters, RILEY, POPE & LANEY, LLC,

Columbia, South Carolina, for Appellees. **ON BRIEF:** Shanon N. Peake, SMITH ROBINSON, LLC, Columbia, South Carolina, for Appellees Riley, Thompson, Lane, Jackson, Brown, Garvin, Pressley, and Whitaker. Daniel R. Settana, Jr., THE MCKAY FIRM, P.A., Columbia, South Carolina, for Appellee McKan.

RICHARDSON, Circuit Judge:

John Telly King was brutally murdered by fellow inmates Jacob Philip and Denver Simmons. King's estate sued the South Carolina Department of Corrections prison guards on duty and their supervisors, alleging that they were deliberately indifferent to King's safety and medical needs and therefore responsible for his death. A magistrate judge disagreed, granting summary judgment to defendants, and King appeals. Finding no error in the judge's decision, we affirm. The prison guards on duty failed to violate a clearly established right so are entitled to qualified immunity. And King failed to allege, or raise a disputed material fact of, any individual involvement by the supervisor defendants.

## I.    Background

King was incarcerated in the Intermediate Care Services Unit at Kirkland Correctional Facility. That Unit houses "inmates with serious persistent mental illness who require intensive treatment . . . but [who] do not need psychiatric hospitalization." J.A. 296.

The Unit, like other units in Kirkland, used inmates as janitors, or—as the prison referred to them—"ward keepers." Ward keepers are apparently chosen based on mental-health counselors' recommendations.[1] They receive special privileges. Of note, their cell doors remained unlocked from 6:00 a.m. to 6:00 p.m., allowing them to move about the Unit and have other inmates in their cell.

---

[1] There is some uncertainty about who selected ward keepers but no evidence in the record would permit a jury to conclude that any defendant chose the ward keepers.

3

These privileges helped Philip and Simmons kill King. Both Philip and Simmons were ward keepers. In fact, they were head ward keepers despite both serving life sentences for double murders and having a violent prison history.[2] One April morning in 2017, they lured King into Simmons's unlocked cell, strangled him with an extension cord,[3] and stuffed his body underneath the bed. Over the next two and a half hours, they murdered three other inmates.

While the murders were occurring, Sergeant DeWaun McKan was on duty. As part of his duties, Sergeant McKan was supposed to conduct security checks every 30 minutes. He did do this. But he had also been trained to look inside the cells when conducting those security checks. He did not do this. When he passed by Simmons's cell on that murderous morning, he did not look inside. And no officer noticed anything was wrong.

Undiscovered and uninterrupted, Philip and Simmons completed their murders. They then left the Unit, walked to the prison's administration building, and told officers there to check Simmons's cell. Those officers radioed Sergeant McKan and another officer, Damien Jones. When Sergeant McKan and Officer Jones entered the cell, they found four bodies. Sergeant McKan radioed for first responders but did not himself administer medical care. Neither did Officer Jones.

---

[2] While being held in jail, before being placed in the South Carolina Department of Corrections, Phillip tried to kill his cellmate. And Simmons received prison disciplinary charges for threatening a correctional guard, cutting himself, and assaulting another inmate with a squeegee.

[3] All inmates were allowed to keep extension cords in their cells.

4

King sued Sergeant McKan, Officer Jones, their immediate supervisors, and Kirkland's warden and associate wardens under 42 U.S.C. § 1983. King alleged that defendants were deliberately indifferent to his safety and medical needs in violation of his Eighth Amendment right to be free from cruel and unusual punishment. The parties elected to proceed before a magistrate judge, who granted summary judgment to defendants. The magistrate judge held that defendants were not deliberately indifferent and that, in any event, they were entitled to qualified immunity. King appeals this decision, and we have jurisdiction.

## II. Discussion

King's estate brings three deliberate-indifference claims. First, King alleges that Sergeant McKan was deliberately indifferent to a substantial risk to King's safety because he failed to protect King by conducting proper security checks.[4] Second, King asserts that Sergeant McKan and Officer Jones were deliberately indifferent to King's medical needs by calling for medical personnel without checking for a pulse or performing CPR on King when they discovered his body. Third, King claims that Warden Riley, Associate Warden Thompson, Associate Warden Lane, and Major Jackson were deliberately indifferent to a substantial risk to King's safety under a theory of supervisory liability.[5]

---

[4] The magistrate judge analyzed this claim for all defendants. On appeal, however, King's briefing focuses only on Sergeant McKan, and so we limit our analysis for this claim to him. *See Grayson O Co. v. Agadir Int'l LLC*, 856 F.3d 307, 316 (4th Cir. 2017).

[5] In one sentence on appeal King argues that "Defendants Riley, Thompson, Lane, Jackson, Brown, Garvey, Pressley, Whitaker, and McKan either maintained actual or constructive knowledge of risk." Appellant's Br. at 30. This sentence is the only place

5

We first discuss the deliberate-indifference standard.  Prison officials violate the Eighth Amendment's cruel-and-unusual-punishment clause when they are deliberately indifferent to a substantial risk to an inmate's safety or medical needs.  *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Estelle v. Gamble*, 429 U.S. 97 (1976).  A deliberate-indifference claim has an objective and subjective element.  *Farmer*, 511 U.S. at 834–37; *Pfaller v. Amonette*, 55 F.4th 436, 445 (4th Cir. 2022).  The objective prong requires the inmate to demonstrate a "substantial risk of serious harm."  *Farmer*, 511 U.S. 834.  The subjective prong requires the inmate to show that the prison official knew about this substantial risk and recognized that their response to that risk was inadequate.  *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004).  That means, even with knowledge of the risk, an official who "responded reasonably to the risk" cannot be found liable under the Eighth Amendment.  *Farmer*, 511 U.S. at 844.

### A.     Failure-to-Protect Claim

We begin with King's claim that Sergeant McKan was deliberately indifferent to King's safety by failing to conduct proper security checks.  At bottom, King argues that Sergeant McKan should be held liable because he walked past Simmons's cell without looking inside despite knowing King faced a substantial risk of inmate violence.  But

---

where Captain Brown, Lieutenant Garvin, Lieutenant Pressley, Corporal Whitaker, and Sergeant McKan are mentioned by name in the brief's supervisory-liability section.  This "passing shot" does not preserve an argument for these defendants.  *See Grayson O*, 856 F.3d at 316.  Accordingly, we evaluate the supervisory-liability claim only for Defendants Riley, Thompson, Lane, and Jackson.

because there is no clearly established constitutional right to properly conducted security checks, McKan is entitled to qualified immunity, and cannot be held liable on this claim.

When a government official is sued in their individual capacity, they are protected by qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[6] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome qualified immunity, a plaintiff must typically show (1) that the government official violated a statutory or constitutional right and (2) that right was clearly established at the time of the challenged conduct. *See Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

That said, the Fourth Circuit has carved out a class of deliberate-indifference claims to treat differently. Acknowledging that qualified immunity does not protect officials who *knowingly* disregard the law, *see Malley v. Briggs*, 475 U.S. 335, 341 (1986), we have reasoned that officials who are aware that their conduct is constitutionally deficient cannot rely on the clearly established prong, *Pfaller*, 55 F.4th 446–47 (citing *Thorpe v. Clarke*, 37 F.4th 926, 933–40 (4th Cir. 2022)). We have said that, sometimes, context makes the violation "obvious" and case law is thus not needed to establish this awareness. *See id.* at 447 (quoting *Thorpe*, 37 F.4th at 934). So when a defendant knows her conduct does not pass constitutional muster, we do not look to see if she violated clearly established precedent. *Thorpe*, 37 F.4th at 939–40. Instead, we ask only if her actions violated the

---

[6] "[Q]ualified immunity is 'controversial, contested, and *binding*.'" *Stanton v. Elliott*, 25 F.4th 227, 237 (4th Cir. 2022) (quoting *Dean ex rel. Harkness v. McKinney*, 976 F.3d 407, 422 (4th Cir. 2020) (Richardson, J., dissenting)).

Eight Amendment. *See Pfaller*, 55 F.4th at 446. But, if she did not know her actions violated the Eighth Amendment, she is entitled to the same two-pronged, qualified-immunity approach as every other government official. *Id.* at 448 ("In such a case, the 'clearly established' prong continues to perform work independent of the 'constitutional-violation' prong.").

Sergeant McKan is entitled to the two-prong approach. To see why, consider the substantial risk of harm he is alleged to have known about: inmate-on-inmate violence. According to King, Sergeant McKan's conduct is constitutionally deficient because although he took steps to mitigate that risk—for example, performing security checks every thirty minutes—he did not look in the cells on those checks. Yet the Constitution does not "obvious[ly]" require he look in the cells to mitigate the risk of inmate-on-inmate violence. *See id.* at 447 (quoting *Thorpe*, 37 F.4th at 934). So context did not make him aware of a knowing violation of the law. *See id.* We thus cannot say that McKan did not "need case law to tell him" that his conduct was constitutionally deficient. *Id.* at 446.

Turning to the applicable two-prong approach, we may address the prongs in whatever order we choose. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, we start with the clearly established prong. Under that prong, McKan is immune from suit if there was no clearly established right to properly conducted security checks when the murders occurred in April 2017. *See al-Kidd*, 563 U.S. at 735.

A right is clearly established if existing precedent—either controlling case law or a "consensus of persuasive authority" from other Circuits, *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017)—has placed the question beyond debate. *Taylor v. Barkes*,

8

575 U.S. 822, 825 (2015). While this standard does not require "a case directly on point," the case law must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* (quoting *al-Kidd*, 563 U.S. at 741).

The first step in assessing if a right is clearly established is defining the right at issue. *See Pfaller*, 55 F.4th at 445. The Supreme Court has consistently admonished that we are "not to define the clearly established law at a high level of generality." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)); *see also Brosseau v. Haugen*, 543 U.S. 194, 198–99 (2004). Instead, we "pinpoint the precise constitutional right at issue." *Pfaller*, 55 F.4th at 445. And while it's true that we require less specificity when defining the right in the Eighth Amendment context than when the Fourth Amendment is implicated, *see id.* at 453, the unlawfulness must still be "apparent" based on pre-existing law. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

The right at issue here is King's right to have to have a correctional officer look into the cell window while conducting a security check—given a known and substantial risk of inmate-on-inmate violence in the Unit.[7] So—even if the risk of inmate violence was

---

[7] This risk must be more specific than "the general risks that all the inmates posed to one another and prison officials." *Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). We have explicitly rejected the idea that knowledge of a general risk of violence in a prison unit can establish deliberate indifference. *Id.* at 339 (no deliberate indifference when the facts did not show that the defendant-guard "knew that his actions exposed [inmate] to a specific risk distinct from the general risk of violence from other inmates . . . to which [inmate] was always exposed, and of which [defendant-guard] was certainly aware"); *see*

substantial and Sergeant McKan knew that—King needs precedent establishing that

Sergeant McKan's efforts to mitigate that risk (i.e., security checks without looking in

cells) were constitutionally deficient.[8]

King does not point to any analogous cases establishing this specific right.[9] Instead,

he relies on the principle that a right can be clearly established if it is "manifestly included

---

*also Parrish*, 372 F.3d at 305 (no deliberate indifference where detainee aspirated on his vomit after officers placed a spit mask on him because officers were only aware of "general risks" that intoxicated individuals could die from aspiration and not "the incremental risk that they themselves created by leaving the spit mask over [the detainee's] head.").

The dissent mostly relies on the general risk in arguing that Sergeant McKan should not receive qualified immunity. *See* Dissenting Op. at 27–29. It identifies only one specific fact to show that Sergeant McKan was deliberately indifferent to an obvious risk: a disciplinary report that Simmons hit an inmate with a squeegee several months before the murders. Dissenting Op. at 28. But this report cannot show that McKan knew that Simmons and Philip posed a *substantial* and known risk to other inmates. *See Cox v. Quinn*, 828 F.3d 227, 239 (4th Cir. 2016). And the report does nothing to make it obvious that Simmons and Philip were likely to brutally murder four inmates.

[8] Echoing the dissent's error, King argues that the right at issue is the general right to be protected from inmate violence. But this defines the right too broadly. Remember, the critical inquiry is whether case law alerted Sergeant McKan that his conduct was constitutionally deficient. And even accepting a clearly established right to keep King safe from inmate violence, that would not mean a reasonable officer in Sergeant McKan's shoes would understand that conducting safety walks without looking into cells violates that right. *See Pfaller*, 55 F.4th at 452–55 (searching to see if our case law provided defendant "fair warning" that he violated a patient's right to receive medical care in the specific context of the case). More specificity is needed. *See Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 683 (4th Cir. 2023) ("A reasonable officer will be unable to determine how the relevant legal doctrine will apply to the factual situation if the circumstances differ too much from prior cases." (cleaned up)).

[9] The dissent points to *Makdessi v. Fields*, 789 F.3d 126 (4th Cir. 2015), claiming it clearly establishes that Sergeant McKan was deliberately indifferent to an obvious risk of harm. In *Makdessi*, we held that prison officials were deliberately indifferent because the risk of harm was so obvious that the officials must have known about it. *Id.* at 134–35.

within a more general application[ ] of the core constitutional principle invoked." *Pritchett v. Alford*, 973 F.2d 307, 314 (4th Cir. 1992). The theory being that "[i]n some cases, government officials can be expected to know that if X is illegal, then Y is also illegal, despite factual differences between the two." *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019). King says that *Farmer v. Brennan*, 511 U.S. 825 (1994), establishes a prisoner's right to be free from an official's deliberate indifference to a substantial risk of serious harm. And he claims that this general principle manifestly includes the right to have a prison official look in his cell during security checks.

He's wrong. *Farmer* provides general guidance about Eighth Amendment deliberate-indifference claims. Indeed, it is the case in which the Supreme Court explained what deliberate indifference means in the Eighth Amendment context. *Farmer*, 511 U.S. at 835–37. But *Farmer* provides no guidance about how the Eighth Amendment applies to this case's "specific context." *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Brosseau*, 543 U.S. at 198). So *Farmer* does not make it apparent that Sergeant McKan

There, Makdessi complained to prison officials for years about the abuse he suffered. *Id.* at 129. They responded by ignoring his complaints or calling him racial slurs and threatening him with further abuse. *Id.* at 129, 130. Three years after his first complaint, he was placed in a cell with a violent gang member, who beat and raped him. *Id.* at 129. Makdessi reported the rape, but officials ignored the report and a written policy requiring him to be transferred to a new cell. As a result, he was beaten and raped a second time. *Id.* Given these facts, it's no wonder we held that the officials were deliberately indifferent to an obvious risk. And considering the differences between *Makdessi* and this case, that the risk was obvious in *Makdessi* says little about whether it was obvious here. *Cf. Mullenix v. Luna*, 577 U.S. 7, 18 (2015) ("[T]he mere fact that courts have approved deadly force in more extreme circumstances says little, if anything, about whether such force was reasonable in the circumstances here.").

11

violated the Eighth Amendment by failing to look into each cell during his security checks. *See Barkes*, 575 U.S. at 825–27 (finding no clearly established right to "proper implementation of adequate suicide prevention protocols" where the Court had never "even discusse[d]" that context). *Farmer* thus fails to clearly establish this "right."

Nor does King's allegation that Sergeant McKan violated internal procedures help. True, Sergeant McKan was trained to look in the cell windows during security checks. And other defendants acknowledged that was best practice. Yet the record does not show a policy *requiring* an officer to look in each cell window. Even if it did, knowingly violating a prison policy does not amount to deliberate indifference. *See Rich*, 129 F.3d at 339–40 (applying *Farmer* to hold that an officer was not deliberately indifferent despite knowingly violating prison regulations); *see also Tucker v. Evans*, 276 F.3d 999, 1001–02 (8th Cir. 2002) (holding that a correction officer's failure to properly perform security checks was, at most, gross negligence). Not every violation of prison policy is a violation of the constitution. And qualified immunity cares about violations of clearly established constitutional law, not clearly established prison policy. So whether Sergeant McKan violated the prison's rule shines little light on whether he also violated King's clearly established Eight Amendment rights.

With hindsight, we know that Sergeant McKan should have conducted security checks by looking into cells rather than walking around. But King has not shown that

12

Sergeant McKan's failure to do so violated his clearly established rights.  So Sergeant McKan is entitled to qualified immunity.[10]

### B.      Medical-Needs Claim

King also claims that Sergeant McKan and Officer Jones were deliberately indifferent to King's medical needs when they opened the door to Simmons's cell, saw four bodies, including King, and called for medical personnel rather than rendering medical assistance themselves.  But to repeat, overcoming qualified immunity requires King to show that Sergeant McKan's and Officer Jones's conduct violated a clearly established right.  *See al-Kidd,* 563 U.S. at 735.  It didn't. So we affirm the magistrate judge's grant of summary judgment.

Rather than claiming that our own controlling precedent clearly established that Sergeant McKan's and Officer Jones's conduct violated the Eighth Amendment, King identifies cases from four other circuits holding that an officer is deliberately indifferent when he fails to render aid to a prisoner who appears to be unconscious or dead.  *See Lemire v. Cal. Dept. of Corr. & Rehabilitation*, 726 F.3d 1062, 1082–83 (9th Cir. 2013); *McRaven v. Sanders*, 577 F.3d 974, 983–84 (8th Cir. 2009); *Jones v. City of Cincinnati*, 521 F.3d

---

[10] The dissent errs by largely lumping the prison staff together, rather than considering Sergeant McKan individually.  *See Taylor v. Riojas*, 141 S. Ct. 52, 54 (2020); *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009); *see also Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022) ("Collective knowledge cannot make out deliberate indifference.").  For example, the dissent repeatedly admonishes the staff's decision to give Phillip and Simmons special privileges as ward keepers despite their particularly violent criminal histories and medical diagnoses. Dissenting Op. at 21; *see also id.* at 19, 29. But there is no evidence that Sergeant McKan had any role in this decision or that Sergeant McKan knew the all the details about Phillip and Simmons.

13

555, 560 (6th Cir. 2008); *Bozeman v. Orum*, 422 F.3d 1265, 1274 (11th Cir. 2005). He asks us to hold that these four cases amount to a "consensus of persuasive authority" clearly establishing that the officers' actions were unconstitutional. *See Booker*, 855 F.3d at 544.

Those cases do not come close to establishing such a consensus. King's problem is two-fold. First, two of those cases are distinguishable from the right King claims. In *Jones* and *Bozeman*, the officers took no action at all. *See Jones*, 521 F.3d at 560 (explaining that the officers "'stood there and discussed the absence of fire personnel' after they noticed Jones was not breathing."); *Bozeman*, 422 F.3d at 1274 (explaining that "the officers knew [the inmate] was unconscious and not breathing and . . . did nothing."). Yet Sergeant McKan and Officer Jones called for medical personnel as soon as they found King's body. [J.A. 227–28.] This is a key difference, because "good-faith efforts to remedy a plaintiff's problems will prevent finding deliberate indifference, absent extraordinary circumstances." *Koon v. North Carolina*, 50 F.4th 398, 407 (4th Cir. 2022). *Jones* and *Bozeman* suggest that officers must do *something* when they come across an unconscious prisoner, but they do not help officers understand what constitutes sufficient good-faith efforts in this context. So they do not clearly establish Sergeant McKan's and Officer Jones's conduct violated the Eighth Amendment.

Second, without *Jones* or *Bozeman*, King is left with two out-of-circuit cases. And while those two cases do hold that King has the right he claims, *see Lemire*, 726 at 1082–83; *McRaven*, 577 F.3d at 983–84, that's not enough for a "consensus," *Booker*, 855 F.3d at 538. This is all the more true given that other persuasive authorities go the other way. The Fifth Circuit, and our own Circuit in an unpublished opinion, have held that King's

14

claimed right does not exist.  *See Brumfield v. Hollins*, 551 F.3d 322, 332–33 (5th Cir. 2008); *Ward v. Holmes*, 28 F.3d 1212, *3, *7 (4th Cir. 1994) (unpublished table decision). Given the thin support for King's position, he has not shown that the officials violated his clearly established rights by calling for medical aid but not providing it themselves. Therefore, Sergeant McKan and Officer Jones are entitled to qualified immunity.

## C.    Supervisory-Liability Claim

Lastly, King brought a supervisory-liability claim of deliberate indifference against Warden Riley, Associate Wardens Thompson and Lane, and Major Jackson.  His claim fails because he neglected to allege or produce evidence that any individual defendant violated his rights.

The Supreme Court explained in *Ashcroft v. Iqbal* that, in the context of § 1983, "the term 'supervisory liability' is a misnomer." 556 U.S. at 677.  "Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."  *Id.* at 676.  Put differently, "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct."  *Id.* at 677.  And a supervisor's "mere knowledge" that his subordinates are engaged in unconstitutional conduct is not enough.  *Id.*  Liability is thus determined person by person:  A plaintiff must show "each Government-official defendant, through the official's own individual actions, has violated the Constitution."  *Id.*; *see also Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

As liability here is personal, a complaint must contain specific allegations of each individual's conduct and state of mind. *Iqbal*, 556 U.S. at 677.  So too must a plaintiff put

15

forward evidence at summary judgment to support those allegations. At summary judgment, a plaintiff must identify evidence that each individual defendant acted (or failed to act) with a culpable state of mind. *See Taylor*, 141 S. Ct. at 54 (noting the need for "officer-by-officer analysis"). Without this defendant-specific evidence, a plaintiff cannot get past summary judgment. *See Moss v. Harwood*, 19 F.4th 614, 624–25 (4th Cir. 2021); *Danser v. Stansberry*, 772 F.3d 340, 349–50 (4th Cir. 2014).

King ignores this requirement. Nowhere does he identify how each defendant violated the constitution. This is a prerequisite to a supervisory-liability claim. *See Iqbal*, 556 U.S. at 677. Nor does King present a material dispute about the any individual defendant's knowledge. Instead, King only claims that defendants "either maintained actual or constructive knowledge of the risk" (whatever that risk may be). Appellant's Br. at 30. This boilerplate conclusion—lacking defendant specificity and factual support—does not state a claim for relief or allow a plaintiff to get past summary judgment. *See Timpson ex rel. Timpson v. Anderson Cnty. Disabilities and Special Needs Bd.*, 31 F.4th 238, 258 (4th Cir. 2022). So King's supervisory-liability claim fails.

*             *             *

As the magistrate judge recognized, John Telly King's brutal murder—along with three other inmates—was an atrocity. But atrocities occur in prison without the prison bearing responsibility: "[E]very injury suffered by one prisoner at the hands of another" does not translate "into constitutional liability for prison officials responsible for the victim's safety." *Farmer*, 511 U.S. at 834. This is particularly true so long as the qualified-immunity doctrine exists. That doctrine is controversial and roundly criticized. *See Sharpe*

16

*v Winterville Police Dep't.*, 59 F.4th 674, 684 n.12 (4th Cir. 2023). But it is also binding, and so we must faithfully apply it.

Sergeant McKan is entitled to qualified immunity because he did not violate King's clearly established rights when he failed to look in each cell during security checks. For the same reason, Sergeant McKan and Officer Jones are entitled to qualified immunity when they called for first responders but did not render medical assistance themselves. And King failed to put forward evidence specific to any of the remaining defendants to show that they are liable under a theory of supervisory liability. Accordingly, the magistrate judge's grant of summary judgment to defendants is

*AFFIRMED*.

WYNN, Circuit Judge, dissenting:

Jacob Philip and Denver Simmons systematically and brutally murdered four of their fellow prison inmates. Both Philip and Simmons were housed (along with the four victims) in a special unit designated for inmates, like them, with "serious persistent mental illness who require intensive treatment, monitoring, and care." But instead of providing "intensive treatment, monitoring, and care" to Philip and Simmons—who were themselves convicted double murderers—the prison staff gave them special privileges that allowed them to move about freely in the unit, apparently without supervision or detection, during most of the day.

The family of one of the victims, John Telly King, believes that the prison officials should be held accountable for their deliberate indifference to the safety of the other inmates in the unit. I agree with King's family.

The core facts are not in dispute. There is no dispute that the prison-official Defendants knew that the unit housed inmates with severe mental illnesses who, per prison policy, required intensive monitoring; that a number of the inmates were classified as violent offenders; that the inmates had significant latitude to move freely about the unit each day; and that the eventual murderers were given positions of authority within the unit, which included the liberty to keep their cell doors unlocked all day long and to store cleaning supplies in their cells. There is no dispute that the security guard on duty knowingly conducted improper security checks; he admitted to it. And there is no dispute that four horrific murders occurred, and that they went undetected by prison officials for

18

almost *three hours* until the killers left the unit, walked uninhibited across the prison yard to another building, and voluntarily turned themselves in.

In my view, these facts more than suffice to show an Eighth Amendment violation. And yet the majority absolves Defendants on qualified-immunity grounds. I must dissent.[1]

## I.

The majority gives short shrift to the facts, but we must confront them.

On the morning of April 7, 2017, over the course of two-and-a-half hours, Denver Simmons and Jacob Philip lured, one after the next, four of their fellow inmates into Simmons's cell and brutally murdered each one. All six inmates lived in the same building, within the Intermediate Care Services unit in a South Carolina state prison. The Intermediate Care Services unit exists for inmates with "serious persistent mental illness who require intensive treatment, monitoring, and care" short of psychiatric hospitalization.

---

[1] The fact that four separate murders could occur in a state prison on the same day, and go undetected for hours, is as clear a sign as any that something was terribly wrong in how the prison was run. My concerns apply to all Defendants, who were each answerable for the safety of the inmates and each bear some responsibility for what happened under their watch. For that reason, I discuss the failings of all Defendants in this case.

But for the purposes of the legal claims on appeal, I would reverse the grant of summary judgment as to Defendant Dewaun McKan on King's failure-to-protect claim. I am constrained by the record on appeal to conclude that King has not carried his burden of showing a genuine dispute to survive summary judgment as to the other Defendants. For the same reason, I would also affirm the district court as to King's medical-needs claims against McKan and Damian Jones.

J.A. 296.[2] In other words, all inmates in the Intermediate Care Services unit have known, diagnosed, and serious mental illnesses.

At the time of this tragedy, the Intermediate Care Services unit building housed about 150 inmates across two wings. The inmates in the unit had varying security classifications, both violent and nonviolent. Prison officials recognized that the Intermediate Care Services unit was "different" in this way from a traditional prison dorm. J.A. 764. In addition to some counseling and program staff, the 150 inmates within the unit were monitored by two security guards, one for each wing.

The daily routine of the Intermediate Care Services unit was highly fluid. From about 6:00 a.m., when they were released for breakfast, until the first standing count of the unit at 10:30 a.m., the inmates were generally permitted to be outside their cells, doing chores, mingling in the common area, and attending counseling appointments.

The murderers, Simmons and Philip, were both serving life sentences for double murder. In Philip's case, he was convicted for murdering his girlfriend and her nine-year-old daughter. And just before he was transferred to the state prison system, while in county jail, he attempted to kill his cellmate. The former program manager for the Intermediate Care Services unit testified that Philip "doesn't have a soul" and "just didn't really like people." J.A. 2276.

Both Simmons and Philip were diagnosed with severe mental illnesses—personality disorder, auditory hallucinations, and depression with repeated suicide attempts for

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

Simmons; schizoaffective disorder of a bipolar type with a history of auditory hallucinations for Philip. And both had been placed in the state prison's psychiatric hospital before they were transferred to the Intermediate Care Services unit. In the months prior to the murders, Simmons incurred three separate disciplinary infractions while in the Intermediate Care Services unit: for threatening an officer, striking another inmate with a squeegee, and attempting suicide.

The four victims—John King, William Scruggs, Jimmy Ham, and Jason Kelley—also suffered from serious mental illnesses, with histories including schizophrenia, psychotic disorders, schizoaffective disorder, paranoia, and auditory hallucinations. They were described, in the words of one prison official, as "small [and] vulnerable inmates." J.A. 1339.

Despite their particularly violent criminal histories, medical diagnoses, and, in Simmons's case, repeated disciplinary infractions, both Simmons and Philip were granted the privilege of serving as wardkeepers for the Intermediate Care Services unit. The primary duty for the wardkeepers was to gather cleaning supplies, such as mops, brooms, and chemicals, each day from the building's supply closet and pass them out to the other inmates so they could clean the building. As a result, Simmons and Philip were afforded certain liberties. They were allowed to keep the cleaning supplies in their cells during the day. And they were permitted to have their cell doors unlocked between the hours of 6:00 a.m. and 6:00 p.m., whereas the cell doors for the other inmates were to remain locked during this time even if the inmates were outside their cells.

21

The four horrible murders on April 7, 2017, began at 7:49 a.m. when Simmons and Philip called John King into Simmons's cell with an offer for a cup of coffee. They targeted King because he was "little" and offered minimal resistance. J.A. 2417. Once inside the cell, they strangled King with an extension cord before "stuffing" him under the bed. J.A. 2417.

About thirty minutes later, at 8:23 a.m., William Scruggs entered Simmons's cell, where Philip attacked him. Scruggs seemingly tried to fight back, but Simmons strangled him with an extension cord before Philip "stomped" on his ribs, causing them to "pop." J.A. 2417. They then placed him on the bed in the fetal position.

A half hour later, at 9:03 a.m., Simmons and Philip enticed Jimmy Ham into the cell under the pretense of offering him drugs. Ham purportedly put up the most resistance and the killers were afraid he would alert someone, but Simmons stabbed him with a broken broom handle that he had "stashed" in his cell while Philip strangled Ham from behind. J.A. 2421. They left Ham on the bed with Scruggs.

At this point, the killers took a break. They walked outside "for a few minutes," leaving Scruggs and Ham on the bed under a sheet and placing a trash bag over the cell window to block the view inside. J.A. 2422. But Simmons "wanted to get one more" and targeted Jason Kelley, with whom he had a prior dispute. J.A. 2422.

And so twenty-seven minutes after they attacked Ham, at 9:30 a.m., Simmons and Philip lured Kelley into the cell with a promise to show him something "cool." J.A. 2417. They then strangled Kelley with their forearms, an extension cord, and a broom handle,

22

while Philip stepped on Kelley's neck. They left Kelley on the floor, with the extension cord around his neck, and left the cell.

At 10:13 a.m.—two-and-a-half hours after King, the first victim, was attacked and 45 minutes after Kelley, the last victim, met the same fate—Simmons and Philip walked out of the Intermediate Care Services unit building on their own accord. They made their way across the prison yard, unimpeded, to a different, administrative building. And they told prison officials to check Simmons's cell. Only then were the four victims discovered.

Notably, although Simmons and Philip plainly believed each victim was dead when they moved on to the next, the coroner estimated the time of death for each as falling between 10:00 and 10:30-11:00 a.m.

Simmons and Philip were able to come and go as they pleased from Simmons's cell, with the door unlocked, because of their status as wardkeepers. Simmons was also able to "stash" a broom in his cell for the same reason. If one wonders how Simmons and Philip were also able to use an extension cord as a murder weapon, it was evidently routine practice to permit the Intermediate Care Services unit inmates to purchase such cords from the canteen.

Dewaun McKan was the only guard on duty in the specific wing of the Intermediate Care Services unit building where the murders occurred. Part of McKan's job was to do routine security checks throughout the day. There was apparently no written policy in place governing these checks. But the evidence overwhelmingly shows that the checks were to occur every thirty minutes throughout the day, and that McKan was trained to walk by each cell, look into the window to verify the inmate was present and safe and there was no

23

contraband, and pull the door handle to make sure the door was locked. If the window was covered, McKan was to instruct the inmate to remove the covering.[3]

McKan, however, testified that it was "not abnormal"—indeed, it was "common"—for him to walk by a cell without looking into it, especially when the inmates were out in the common area or rec yard. J.A. 154–55. Such was the case on April 7, when McKan—by his own admission and corroborated by footage from the surveillance video—did *not* stop and look into every cell, including Simmons's. Further, there is no dispute that for at least part of the morning the window to that cell was covered. McKan made *five separate* rounds in the hours after King, the first victim, was attacked. This included walking past Simmons's cell mere minutes after King entered.[4] McKan did not look into each cell. He did not check for contraband. He did not verify the location and safety of every inmate. Such, apparently, was his "common" practice.

## II.

Those are the facts. Here is the law.

The Eighth Amendment proscribes "cruel and unusual punishments." U.S. Const. amend. VIII. In doing so, it has been construed as placing both restraints and duties on

---

[3] On the advice of the mental health counselors who worked in the Intermediate Care Services unit, the guards would sometimes excuse temporary violations of this rule, e.g., if the inmate was using the toilet in their cell. But this was a temporary allowance, and an appropriate security check involved actually looking into the cell.

[4] King entered Simmons's cell at 7:49 a.m. McKan started his next security check at 7:57 a.m.

24

prison officials. This includes a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).

To establish a valid Eighth Amendment claim, an inmate must satisfy two elements. First, the inmate must show that he suffered an objectively "sufficiently serious" deprivation. *Cox v. Quinn*, 828 F.3d 227, 235 (4th Cir. 2016) (quoting *Farmer*, 511 U.S. at 834). No one disputes that here, for obvious reasons.

Second, the inmate must show that the prison official acted with a "sufficiently culpable state of mind," specifically, "deliberate indifference" to the inmate's health or safety. *Id.* at 236. Deliberate indifference requires a showing that the prison official "subjectively recognized a substantial risk of harm" and "subjectively recognized that his actions were inappropriate in light of that risk." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (internal quotation marks omitted). To be sure, deliberate indifference is a "high standard," requiring proof that the prison official had actual knowledge, both of a substantial risk of harm and that his actions were inappropriate in light of that risk. *Danser v. Stansberry*, 772 F.3d 340, 347 (4th Cir. 2014).

But this Court has been abundantly clear that "even under this subjective standard, a prison official cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995). In other words, a risk of harm might be "so obvious" that we can fairly conclude that the prison official "*did* know of it because he could not have failed to know of it." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Brice*, 58 F.3d at 105). And so on similar facts, we explained that an inmate—described, much like the victim King here, as a "short,

25

middle-aged prisoner with physical and mental problems that ma[d]e him vulnerable to harassment and attacks by other inmates"—could plausibly allege deliberate indifference when he was placed in a cell with a prison gang member and subsequently sexually assaulted, if he could show that the risk of harm was so obvious that prison officials must have known about it. *Id.* at 134–35 (internal quotation marks omitted).[5]

We did not write on a blank slate in reaching these conclusions. Our source was the Supreme Court itself. It was the Supreme Court that instructed that deliberate indifference is established not only when the prison official "knew of a substantial risk" of serious harm, but also when the official "*must have known*" about the risk. *Farmer*, 511 U.S. at 842 (emphasis added). It was the Supreme Court that informed us that a court may conclude that a prison official knew about a risk from "the very fact that the risk was obvious." *Id.* And it was the Supreme Court that told us that a "failure [by the inmate] to give advance notice [about the risk] is not dispositive" to an inmate's claim. *Id.* at 848. Indeed, the Supreme Court even rejected the idea that something bad must happen first before deliberate indifference could be shown: "a subjective approach to deliberate indifference does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief." *Id.* at 845 (cleaned up); *cf. Washington*

---

[5] While the victim in *Makdessi* had previously complained to prison officials about prior attacks, we expressly noted that "whether a prisoner protests or complains before he is injured may be irrelevant" to the deliberate indifference inquiry. *Makdessi*, 789 F.3d at 136.

26

*v. Hous. Auth. of the City of Columbia*, 58 F.4th 170, 180 (4th Cir. 2023) (government agencies do not get a "one free death" card).

In *Farmer*, the Supreme Court vacated a grant of summary judgment in favor of prison-official defendants on an Eighth Amendment claim brought by a transgender female inmate who had been "beaten and raped by a cellmate" while being held "in male prisons." *Makdessi*, 789 F.3d at 134. The Court concluded that the lawsuit could be successful "if it could be shown that the plaintiff's condition and [feminine] appearance, coupled with the knowledge of violent assaults in the prison, made it reasonable to believe that the defendants were aware of a serious risk to the plaintiff but took no protective action." *Id.* (citing *Farmer*, 511 U.S. at 848–49). Following the Court's lead, we, too, have found that deliberate indifference may be established where a risk of harm is so obvious that prison officials must have known about it. *See, e.g.*, *Cox*, 828 F.3d at 237; *Makdessi*, 789 F.3d at 133–36; *Brice*, 58 F.3d at 105–06. As we succinctly concluded two years before the events giving rise to the present case, "prison officials may not simply bury their heads in the sand and thereby skirt liability," even under the deliberate-indifference standard. *Makdessi*, 789 F.3d at 133.

### III.

### A.

That is the law. Here is how that law applies to the facts of this case.

As discussed, this case turns on the subjective prong of an Eighth Amendment claim. We must ask what the prison-official Defendants actually knew about the risk of

harm in the Intermediate Care Services unit and the risks posed by their actions. *See Parrish*, 372 F.3d at 303.

But Defendants disclaimed knowledge about these risks, some of which boggle the mind. For example, multiple Defendants in the chain of command were seemingly blissfully unaware of Simmons's and Philip's backgrounds, denying any knowledge about their criminal histories (double murders), medical diagnoses, or disciplinary infractions. This, despite the fact that these inmates were put in positions of trust and authority within the prison's mental health unit. Defendants were equally quick to disavow any role in choosing Simmons and Philip to be wardkeepers.

Nonetheless, it is abundantly clear that the prison officials knew—it was stated in the state prison policy manual—that the Intermediate Care Services unit housed inmates of all security classification levels (violent and nonviolent) who had all been diagnosed with "serious persistent mental illness who require *intensive* treatment, *monitoring*, and care." J.A. 296 (emphasis added). Again, it is undisputed that prison policy expressly required "intensive . . . monitoring" of Intermediate Care Services unit inmates.

The prison officials knew that the inmates were given significant freedom to move around the Intermediate Care Services unit during the day to do chores, attend counseling sessions, or mingle in common areas. They knew that there were two security guards for 150 inmates in the unit. And they knew that Simmons and Philip served as wardkeepers, with permission, during the day, to keep their cell doors unlocked and to keep cleaning supplies like brooms and chemicals in their cells.

28

At minimum, Defendants Vaugh Jackson, Tecorrie Garvin, and McKan knew—because they each signed off on the incident report—that one of these wardkeepers, Simmons, had attacked another inmate *with cleaning supplies* (a squeegee) in late December 2016, less than four months before he killed four men, two of them also with cleaning supplies.

Defendants knew what constituted a proper security check—going to each cell, ensuring the door was locked, and looking through the window to make sure the inmate was safe. And McKan admitted that his security checks on April 7 were inadequate based on this practice, but that it was "common" for him to do them that way without any correction from superior officers. J.A. 155.

And there is, at minimum, strong circumstantial evidence that Defendants knew the Intermediate Care Services unit required enhanced security and rigorous supervision. In addition to the requirement of "intensive" monitoring contained in the policy manual, J.A. 296, just two years before the murders, there was a hostage situation in the Intermediate Care Services unit, which gave prison staff "extra concern," J.A. 2783. And multiple Defendants testified that the Intermediate Care Services unit had more staff than other units at the prison. As the warden, Timothy Riley, acknowledged, due to the "unique nature" of the unit, it was "probably the most heavily staffed unit" at the prison. J.A. 2872.

This is surely enough to survive summary judgment. Given the particularly sensitive and unique nature of the Intermediate Care Services unit—home to inmates, both violent and nonviolent offenders, who all require intensive treatment and supervision due to severe and longstanding mental illnesses, and yet run in a fluid manner with inmates free to move

29

about the unit—the "risk of harm" to inmates such as the four victims was "so obvious" that we can conclude that prison officials did actually know about it. *See Makdessi*, 789 F.3d at 133. And, at minimum, McKan was subjectively aware that "his actions were inappropriate in light of that risk," *Cox*, 828 F.3d at 236 (internal quotation marks omitted), having admitted to knowing what a proper security check entailed and knowing that security checks were done for inmate safety but nevertheless "common[ly]" failing to do them properly, J.A. 155.

B.

As stated in the majority opinion, to be held accountable via Section 1983, Defendants must have violated a clearly established constitutional right. *Cox*, 828 F.3d at 235, 238. But while we have cautioned against defining the right "at a high level of generality," we are also clear that "there is no requirement that the very action in question must have previously been held unlawful for a reasonable official to have notice that his conduct violated that right." *Pfaller v. Amonette*, 55 F.4th 436, 445–46 (4th Cir. 2022) (cleaned up). And yet that's what the majority opinion does here, defining the right as the right "to have a correctional officer look into the cell window while conducting a security check." Majority Op. at 9.

In conducting the qualified immunity inquiry, "we must define the right 'in light of the specific context of the case, not as a broad general proposition.'" *Cox*, 828 F.3d at 238 (quoting *Parrish*, 372 F.3d at 301). But "the exact conduct at issue" need not have been previously held unlawful, and "our analysis must take into consideration not only already specifically adjudicated rights, but those manifestly included within more general

30

applications of the core constitutional principle invoked." *Id.* (internal quotation marks omitted). And Eighth Amendment claims in particular "don't require the same level of specificity that is needed in, for example, the Fourth Amendment context." *Pfaller*, 55 F.4th at 445 (citing *Thorpe v. Clarke*, 37 F.4th 926, 940 (4th Cir. 2022)).

Since at least the *Farmer* decision almost thirty years ago, the Supreme Court has been clear that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (alterations omitted). And we have expressly defined the constitutional right in just those terms. *See, e.g.*, *Danser*, 772 F.3d at 346 ("The constitutional right at issue is [the inmate's] Eighth Amendment right to be protected from violence committed by other prisoners.").

In fact, just one year prior to the events in question in this case, we denied qualified immunity in an Eighth Amendment failure-to-protect case, finding this right to be clearly established. *See Cox*, 828 F.3d at 239 ("It has long been established that jail officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners.").

And two years before King was murdered, we vacated the dismissal of an Eighth Amendment claim brought by an inmate who was the victim of sexual assault, reminding the lower court that the victim could show deliberate indifference if the risk of harm to him, a "short, middle-aged prisoner with physical and mental problems that ma[d]e him vulnerable to harassment and attacks," was sufficiently "obvious" that prison officials must have known of it when they allowed the inmate to share a cell with a violent gang member. *Makdessi*, 789 F.3d at 134, 136 (internal quotation marks omitted).

31

My friends in the majority object to this analysis, saying that the risk of harm "must be more specific than 'the general risks that all the inmates posed to one another and [the] prison officials.'" Majority Op. at 9 n.7 (quoting *Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997)). But that view ignores the realities of imprisonment.

In a prison setting, the inmate is involuntarily dependent on the state for his protection in what can only be described as one of the most dangerous environments in the world. In that environment, the prison staff controls and dictates the inmate's daily schedule, work assignments, clothing, and living standards; subjects an inmate's prison funds to "tight[] control," *Burrell v. Staff*, 60 F.4th 25, 50 (3d Cir. 2023); metes out rewards or punishments; limits contact with family and friends outside the prison; and sets exhaustive rules governing every aspect of daily life.

Indeed, it is an environment in which we cannot "ignore the reality that prisons are places where violent criminals are detained, presenting risks of harm far greater than exist on the outside." *United States v. Gore*, 592 F.3d 489, 493 (4th Cir. 2010).

Thus, to speak of a "generalized risk" of harm in prison is to speak of a fiction—and this Court ought not be a prisoner to its own fictions. Common sense tells us that the risk of harm that a prisoner faces from the failure of prison staff to monitor and control other dangerous and violent prisoners is definitionally and continuously "specific." Faced with danger, an inmate has virtually no recourse. Inmates, of course, cannot carry a weapon for self-defense. There is nowhere to retreat. And within the Intermediate Care Services unit, they can't even lock their own cell doors—the security guard must lock and unlock the door for them.

32

And yet the majority speaks of "general risks" in prisons, as if the risks are somehow less real because we judges deem them to be "general," or no greater than those faced by each of us every day walking down the street. That's not only a fiction, that's also an absurdity.

It is noble that the majority acknowledges that the temporally separate killing of four prisoners on the same day, in the same prison cell, in a short period of time, by the same two violent inmates, amounted to an "atrocity." Majority Op. at 16. But how the majority then concludes that that "atrocity" was but one of the types of "atrocities [that] occur in prison without the prison bearing responsibility" escapes me. *Id.* That just eschews common sense in this context, ignores the realities of prison life, and sets an artificially high baseline on what constitutes a risk of harm in a prison setting for an Eighth Amendment claim.

Here, the majority opinion's description of the conduct at issue makes McKan's failures seem like minor technical violations. But McKan didn't just fail to look into a few cell windows; he utterly failed to account for the presence and safety of each Intermediate Care Services unit inmate. He *knew* the security checks were inadequate and in violation of his training.

The majority opinion responds that "knowingly violating a prison policy does not amount to deliberate indifference." Majority Op. at 12. But even if violating prison policy *alone* does not amount to deliberate indifference, it can be evidence of knowledge of a risk or intent. *See Brooks v. Johnson*, 924 F.3d 104, 122 (4th Cir. 2019) (in Eighth Amendment excessive-force case, collecting cases and concluding that "whether an officer has

33

complied with or, alternatively, violated a relevant use-of-force policy, while not dispositive, is highly relevant to [the subjective prong of the] inquiry"); *Howard v. City of Durham*, 68 F.4th 934, 950 (4th Cir. 2023) (same, in a wrongful-conviction case).

In this case, McKan made five separate rounds after King was attacked. At no point during these almost three hours did he realize that one, two, three, and ultimately four inmates were unaccounted for and lying dead or unconscious in another cell. His failures mattered, as there is at least a question of fact as to whether proper security checks would have saved the four murdered inmates, especially because the coroner listed the time of death for each—including King—as falling after 10:00 a.m.

In the "specific context of th[is] case," *Parrish*, 372 F.3d at 301, there is an issue of fact regarding whether McKan took "reasonable measures" to abate the substantial risk of harm that inmates like John King faced in the Intermediate Care Services unit, *Thorpe*, 37 F.4th at 935. And, there is an issue of fact regarding whether an objectively reasonable officer in McKan's position would have known that his actions were unreasonable and violated rights "manifestly included within more general applications of the core constitutional principle" articulated in *Farmer* and our case law. *Cox*, 828 F.3d at 239. In short, McKan is not entitled to qualified immunity.

IV.

Thirty years ago, the Supreme Court stated that the Constitution provides a measure of protection for prisoners who are effectively living out their lives as wards of the state—that "the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer*, 511 U.S. at 832

34

(quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). This includes an affirmative duty of prison officials "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833. Given that failure to do so amounts to a constitutional violation, the Court erected two stringent requirements before liability could be imposed. First, not any injury would suffice—the inmate must show a "*substantial* risk of *serious* harm." *Id.* at 834 (emphasis added). And second, the prison official must have acted with deliberate indifference to inmate safety. *Id.*

Deliberate indifference is a high wall for an Eighth Amendment plaintiff to scale. High, but not insurmountable. In rejecting an objective test for deliberate indifference, the Supreme Court dismissed the suggestion that "prison officials [would] be free to ignore obvious dangers to inmates" under its subjective standard. *Id.* at 842. This was because actual knowledge could exist "from the very fact that the risk [of harm] was obvious." *Id.* So, too, this Court has read *Farmer* to lay out the sensible proposition that a risk of harm might be "so obvious" that we may conclude that a prison official "*did* know of it because he could not have failed to know of it." *Brice*, 58 F.3d at 105.

Today, the majority opinion adds an unnecessary brick on top of the already-steep deliberate-indifference wall. In declining to find a constitutional violation on these alarming facts (even if it does so based solely on the idea that the constitutional right in question, if it exists, was not clearly established), the majority provides no further guidance on when a prison official's utter dereliction of his responsibility to provide for the safety and security of prison inmates amounts to an Eighth Amendment violation.

35

Today also, the majority opinion lays out a blueprint for how prison officials can avoid liability under Section 1983. First, the majority opinion incentivizes prison officials to say nothing and make sure no official is "exposed to information concerning [any] risk" of harm. *Farmer*, 511 U.S. at 842. A prison official should avoid telling guards about an inmate's prior history of violent crimes and any risk of danger, and prison staff are advised that they should not ask who has special privileges in a unit or what those privileges entail. In addition, there should not be a written policy in place governing security checks and related safety protocol. Finally, the majority opinion informs prison officials that should something go wrong, they should wash their hands and disclaim any actual knowledge. This, despite our express admonition that "prison officials may not simply bury their heads in the sand and thereby skirt liability." *Makdessi*, 789 F.3d at 133.

But a faithful reading of Supreme Court and our own precedent requires more. For while "[f]ederal courts sit not to supervise prisons," we must continually strive "to enforce the constitutional rights of all 'persons,' including prisoners." *Cruz v. Beto*, 405 U.S. 319, 321 (1972). With respect for my good colleagues in the majority, I dissent.

36