**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 24-6953**

———————

BRANDON CASE,

        Plaintiff - Appellant,

    v.

OFFICER BEASLEY, a correctional officer; OFFICER URIETA, a correctional officer; KENNY CUSTODIO,

        Defendants - Appellees,

and

UNKNOWN EMPLOYEES OF THE STATE OF NORTH CAROLINA

        Defendant.

———————

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever, III, District Judge.  (5:21-ct-03157-D)

———————

Argued:  October 22, 2025                    Decided:  February 17, 2026

———————

Before QUATTLEBAUM, HEYTENS, and BERNER, Circuit Judges.

———————

Vacated and remanded with instructions by published opinion. Judge Berner wrote the opinion, in which Judge Heytens joined. Judge Quattlebaum wrote a dissenting opinion.

———————

**ARGUED:**  Alison R. Leff, LOEVY & LOEVY, Chicago, Illinois, for Appellant.  John Locke Milholland, IV, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh,

North Carolina, for Appellees. **ON BRIEF:** Rosalind E. Dillon, LOEVY & LOEVY, Chicago, Illinois, for Appellant. Jeff Jackson, Attorney General, Tanner J. Ray, Assistant Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

BERNER, Circuit Judge:

The Eighth Amendment prohibits the imposition of cruel and unusual punishments. This prohibition requires prison officials to take reasonable measures to protect incarcerated individuals from violence inflicted by others in prison custody. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). This is because incarcerated individuals are deprived of "virtually every means of self-protection and . . . access to outside aid." *Id.* As such, prison officials violate the Eighth Amendment when they act with deliberate indifference to a substantial risk of serious harm to an incarcerated individual.

Brandon Case was incarcerated in the general population at Central Prison in North Carolina when he was brutally attacked by a "safekeeper"—a designation given by the state prison system to certain individuals, including unusually violent pre-trial detainees. The safekeeper was able to assault Case because prison correctional officers failed to take reasonable action to protect him from the known and substantial risk safekeepers pose to those in the general population—the very reason they are separated in the first place.

Case sued three prison correctional officers, Brandon Beasley, Eric Urieta, and Kenny Custodio, under 42 U.S.C. § 1983, for deliberate indifference in violation of his right to humane conditions of confinement. The district court granted summary judgment to the correctional officers, concluding that the record does not contain sufficient evidence upon which a reasonable jury could conclude that the correctional officers violated Case's rights under the Eighth Amendment. The district court also ruled that, even if genuine issues of material fact remain as to the correctional officers' liability, they were nevertheless entitled to qualified immunity.

3

We conclude that genuine disputes of material fact remain on both the issue of the correctional officers' liability and whether qualified immunity is appropriate. Accordingly, we vacate the ruling of the district court and remand for further proceedings.

## I. Background

### A. Relevant Facts

Plaintiff-Appellant Brandon Case was incarcerated in the general population at Central Prison in North Carolina. North Carolina prison policy requires incarcerated individuals to remain separated in two groups—those in the general population and pre-trial detainees designated as "safekeepers." The policy designates as safekeepers, among others, pre-trial detainees who have exhibited "violently aggressive behavior that cannot be contained and warrants a higher level of supervision" or otherwise "pose[ ] an imminent danger . . . to other prisoners." J.A. 22 (State of North Carolina Department of Public Safety, Prisons, Policy & Procedures, ch. C § .1601(b)(1)).[1] Some pre-trial detainees who "require[ ] medical or mental health treatment" are also designated as safekeepers. *Id.* The group of safekeepers and individuals incarcerated in the general population are clothed in different colored uniforms, with the safekeepers clothed in bright yellow to allow them to be more easily identified by the correctional officers.

On the day of the attack, Defendant-Appellants Officers Beasley, Urieta, and Custodio (collectively, the Officers) were responsible for monitoring the movements of

---

[1] Citations to J.A. refer to the Joint Appendix filed by the parties.

incarcerated individuals and prison staff, including maintaining the separation between the safekeepers and the general population. At Central Prison, the two groups were housed on separate floors of Unit 2, with safekeepers on the second floor and the general population on the first.

The Officers were tasked with ensuring that two sets of sliding double doors—called "sallyport" doors—remained closed and locked. These doors separated the hallways on the first and second floors from the stairwell between the floors. The Officers were to open the doors to allow individuals to pass through only after the Officers determined that it was safe to do so. The Officers would make this determination through visual observation from where they sat in the control booths as well as through radio communications from other correctional officers stationed elsewhere in the prison.

That day, Case and several others in the general population went from the first floor of Unit 2 to the second floor to get their hair cut. Going upstairs required that they pass through several hallways, the two sallyport doors, and the stairwell between the floors. Officer Custodio was assigned to the control booth on the second floor; Officer Urieta was assigned to staff the control booth on the first floor; and Officer Beasley was assigned to patrol the housing unit. When Case and the other individuals in the general population initially went upstairs, the safekeepers were outside for recreation. Rather than determining that it was safe to pass before opening the sallyport door between the second floor and the stairwell and then closing it each time, Officer Custodio decided to leave the door open to avoid having to keep opening and closing the door as the general population individuals passed through.

5

Officer Urieta also left the door separating the stairwell and the first-floor hallway open rather than keeping it closed and locked and opening it only upon determining that it was safe to do so. Like Officer Custodio, Officer Urieta did not want the annoyance of having to open and close the door each time to allow the individuals from general population to move between the floors to go to the barber. At some point, Officer Urieta needed to use the restroom, so he asked Officer Beasley to cover his post in the first-floor control booth. Officer Beasley agreed and assumed Officer Urieta's position in the control booth. Officer Beasley too left the door open, rather than keeping it closed and locked as required by prison policy.

Shortly after Officer Urieta left for the restroom while Office Beasley was operating the first-floor control booth, a group of safekeepers began returning to the housing unit from their recreation time. They entered the first-floor hallway on their way to their cells on the second floor. A correctional officer stationed elsewhere in Unit 2 radioed the Officers to let them know that the safekeepers were on their way back.[2] At the same time, Case was finishing his haircut. He then walked through the open sallyport door on the second floor to enter the stairwell, proceeded down the stairs between the second and first floors, passed through the open sallyport door on the first floor, and walked into the first-floor hallway. As he did so, Case passed a group of safekeepers, one of whom

---

[2] Officers Beasley, Urieta, and Custodio claim to have no recollection of these radio communications. Because this case comes to us on summary judgment, however, we view the facts in the light most favorable to Case, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

violently attacked him, striking him repeatedly in his face. Other correctional officers quickly rushed to the scene and separated Case from his attacker.

Case suffered serious injuries, including multiple fractured facial bones. He underwent emergency surgery that included the insertion of metal implants secured by screws in his face. He is expected to suffer from chronic pain for the rest of his life as a result of the attack.

Three days after the attack, the Officers' supervisor, Unit 2 manager John Juehrs, sent a memorandum to all of the correctional officers working in the unit. In his memorandum, Juehrs stressed the importance of keeping safekeepers separated from the general population at all times, noting that "staff [had] become complacent" about the "security and controlled movement" of incarcerated individuals living in the unit. J.A. 40. Juehrs said that the safekeepers and general population had "com[e] in contact too many times when they shouldn't." *Id.* Juehrs also reminded his staff that he had "told everyone over and over" about "doors being left open" and the importance of keeping the doors closed to ensure controlled movement. J.A. 39.

## B.  Procedural History

Case filed suit against Officers Beasley, Urieta, and Custodio in the United States District Court for the Eastern District of North Carolina pursuant to 42 U.S.C. § 1983. Case alleges that each Officer violated his Eighth Amendment rights by failing to protect him from a significant risk of substantial harm in the form of violence by safekeepers.

From the outset, the Officers' counsel neglected the litigation and routinely missed court-established deadlines. Relevant here, the Officers' counsel failed to respond to Case's requests for admission to Officer Custodio. Case then moved for summary judgment on his claim against Officer Custodio, arguing that Officer Custodio's failure to respond meant that he had conceded any defense. The Officers' counsel filed a motion for summary judgment on the Officers' behalf but missed the deadline to oppose Case's motion. In their motion, the Officers argued that Case failed to establish a genuine dispute of material fact as to his Eighth Amendment claims, and alternatively, that the Officers were entitled to qualified immunity.

After the deadline for responsive filings had passed, a new attorney took over the Officers' defense. The new attorney sought an extension of time to file a response to Case's motion and to deem the motion timely filed, explaining that prior counsel had missed the court's deadline because he was busy preparing to leave his position at the North Carolina Department of Justice for a new job.

Case opposed both requests. He argued that the Officers failed to set forth facts sufficient to establish "excusable neglect" as required by Federal Rule of Civil Procedure 6(b), which governs requests for extensions of time. The district court granted both of the Officers' requests. The district court deemed the Officers' motion timely filed, permitted the Officers' belated filing of an opposition to Case's partial motion for summary judgment, and clarified that the parties' motions for summary judgment remained pending.

After the motions were fully briefed, the district court granted the Officers' motion for summary judgment in its entirety and denied Case's motion for summary judgment

8

against Officer Custodio. The district court concluded that, based on the undisputed facts, Case could not succeed on the merits of his Eighth Amendment claims. It also ruled in the alternative that, even if Case had succeeded in demonstrating material facts in genuine dispute with respect to his claims of cruel and unusual punishment, the Officers were each entitled to qualified immunity. Case timely appealed.

## II. Analysis

We review the district court's grant of summary judgment *de novo*. *Aleman v. City of Charlotte*, 80 F.4th 264, 283 (4th Cir. 2023). The court views all the evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmovant. *Id.* at 283–84. Summary judgment is appropriate only if a party shows that there is no genuine dispute of any material fact and the movant is entitled to judgment as a matter of law. *Id.* at 283 (citing Fed. R. Civ. P. 56(a)).

We first address the merits of Case's Eighth Amendment claims. We conclude that genuine disputes of material fact preclude entry of summary judgment in favor of the Officers. We then turn the issue of qualified immunity, and conclude by addressing whether the district court abused its discretion when it granted the Officers' motion for extension of time without reference to the applicable legal standard.

## A. Eighth Amendment

The Constitution does not mandate "comfortable prisons" but nor "does it permit inhumane ones." *Farmer*, 511 U.S. at 832 (citation omitted). Through its prohibition of

9

cruel and unusual punishments, the Eighth Amendment "places restraints on prison officials" and imposes an obligation upon them to "take reasonable measures to guarantee the safety of" incarcerated individuals *Id.* (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). Prison officials have a particular duty "to protect prisoners from violence at the hands of other prisoners." *Id.* at 833 (quoting *Cortes-Quinones v. Jimenez Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988)).

To prevail on an Eighth Amendment claim for failure to protect, an incarcerated individual must satisfy two requirements: first, he must show that the deprivation he suffered was objectively sufficiently serious; and second, he must establish that the defendant had a sufficiently culpable subjective state of mind. *Cox v. Quinn*, 828 F.3d 227, 235–36 (4th Cir. 2016). The parties agree that Case readily satisfied the first requirement. He suffered grievous physical injuries as a result of being attacked. Such injuries readily constitute a sufficiently serious deprivation. Thus, we focus our inquiry on the second requirement—deliberate indifference.

Case need not demonstrate that the Officers acted with the purpose of causing harm or even with the knowledge that harm would result. *Farmer*, 511 U.S. at 835. To defeat summary judgment, Case need only proffer sufficient evidence from which a reasonable jury could find that the Officers acted with deliberate indifference. Deliberate indifference entails more than simple negligence but less than intentional harm. *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). Case must show that genuine issues of material fact remain as to whether the Officers subjectively knew of "a substantial risk of serious harm" but

10

"disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847; *see also Cox*, 828 F.3d at 236. He met this burden.

### 1. Knowledge of Risk

We begin with the Officers' knowledge. "A prison official's subjective actual knowledge can be proven through circumstantial evidence" suggesting, for example, that a particular risk was "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past." *Makdessi*, 789 F.3d at 133 (quoting *Farmer*, 511 U.S. at 842). Also relevant are "circumstances suggest[ing] that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it." *Farmer*, 511 U.S. at 842 (internal quotation marks omitted). It matters not "whether a prisoner face[d] an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Id.* at 843.

There is ample evidence in the record from which a reasonable jury could find that Officers Beasley, Urieta, and Custodio were subjectively aware of the significant risk of serious harm resulting from safekeepers coming into contact with individuals incarcerated in the general population, including Case. Although not dispositive, it is relevant that official prison policy required that the safekeepers be kept separate from the general population. *See Makdessi*, 789 F.3d at 135. In their depositions, all three Officers testified

11

that they knew of the policy and were aware that one reason for the policy was to maintain the safety of the individuals incarcerated in the general population.

The safety risk of allowing safekeepers to come into contact with individuals in the general population was also expressly noted by prison officials and communicated to the Officers. In *Cox v. Quinn*, this court reasoned that "a reasonable jury could . . . decide that [ ] correctional officers knew" an incarcerated individual faced a substantial risk of danger based on a supervisor's testimony that "he specifically told" the officers to abate the risk. *See* 828 F.3d at 237. So too here. After the attack, the Officers' supervisor, Juehrs, circulated a memorandum reiterating the urgency of keeping safekeepers separate from the general population. Juehrs reminded the Officers that safekeepers and individuals in the general population had "com[e] in contact too many times when they shouldn't," and admonished that he had "told everyone over and over" about "doors being left open" and the importance of ensuring that movement through the hallways be controlled. J.A. 39–40.

Evidence in the record also supports an inference that, at the time of the attack, the Officers understood the safekeepers were likely to encounter individuals in the general population. Officers Urieta and Custodio were aware that the safekeepers had left Unit 2 for their recreation period on the morning of the attack. They knew the safekeepers' recreation period typically lasted one hour. They also knew that individuals in the general population were moving between the two floors at the same time. Accordingly, a jury could reasonably infer that Officers Urieta and Custodio would have known that the two groups were likely to encounter one another when the safekeepers returned to Unit 2. It could further be reasonably be inferred that all three Officers would have visually observed the

12

safekeepers coming down the hall toward the individuals from the general population, particularly because each group wore different colored uniforms. Finally, there was evidence upon which a reasonable jury could find that each Officer heard over the radio that the safekeepers' return was imminent.

The Officers point to evidence in the record supporting a finding that they may not have fully appreciated the risk of violence resulting from interaction between the two groups. They emphasize that not every safekeeper is designated as such because of a proclivity toward violent behavior. Some individuals are designated as safekeepers due to medical or mental health related reasons. Furthermore, Officers Beasley and Urieta recalled only one other attack by a safekeeper of an individual in the general population. These facts do not preclude liability for the Officers. The parties do not dispute that at least some safekeepers posed a heightened risk of violence. As the Supreme Court made clear in *Farmer*, so long as the risk of violence is obvious and substantial, it is "irrelevant to liability" that an officer "could not guess beforehand precisely who would attack whom." 511 U.S. at 843 (citation omitted). So too here. The record contains ample evidence to support a conclusion that the Officers were aware at the time Case was attacked that mixing between the general population and safekeepers could create a substantial risk of harm to individuals in the general population.

The Officers also dispute whether they were aware of the safekeepers' return on the day in question. Other correctional officers testified that they communicated the safekeepers' return to Unit 2. The Officers, however, state that no such call was received. These arguments are unavailing. At summary judgment, we must view the facts and draw

13

all inferences in favor of Case, the non-moving party. *Aleman*, 80 F.4th at 283–84. These examples of record evidence supporting conflicting conclusions regarding the Officers' state of mind merely serve to illustrate that genuine issues of material fact remain. A jury must resolve these issues.

### 2. Abatement of Risk

We next address the measures taken by the Officers to abate the substantial risk of serious harm. Prison officials are deliberately indifferent if they "could avert the danger easily yet they fail to do so." *Cox*, 828 F.3d at 236 (quoting *Brown v. N.C. Dep't of Corr.*, 612 F.3d 720, 723 (4th Cir. 2010)). "[T]he Eighth Amendment requires more than some action: It requires reasonable action." *Id*. at 237 (emphasis omitted).

Based on the evidence in the record, a jury could reasonably conclude that each Officer could have abated the risk of safekeepers and the general population coming into contact with one another, yet failed to do so. The Officers were required to keep the doors closed and locked, and to open them only after determining that it was safe. The risk would have been abated had they done so. Moreover, once the Officers were put on notice that the safekeepers were returning to Unit 2, they could have simply pushed a button to close the sallyport doors. They quite literally only needed to lift a finger.

The Officers argue that they responded reasonably because, once the attack began, they immediately called for other correctional officers to come to Case's aid. This argument misunderstands the relevant inquiry. The question before us is whether there is evidence in the record from which a reasonable jury could conclude that the Officers failed

14

to take reasonable steps to abate the substantial risk of attack, not whether the Officers responded reasonably after the attack was already underway.

Because we find that genuine disputes of material fact remain as to the Officers' liability for violation of Case's rights under the Eighth Amendment, we proceed to the question of whether the Officers should be entitled to qualified immunity from liability. We conclude that they are not.

### B. Qualified Immunity

The Officers argue, and the district court agreed, that even if they could be found to have violated Case's right to humane conditions of confinement under the Eighth Amendment, they should nonetheless be shielded by the doctrine of qualified immunity. Qualified immunity is an affirmative defense to liability where a defendant "makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Taylor v. Riojas*, 592 U.S. 7, 8 (2020) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)).

To determine whether the Officers are entitled to qualified immunity at summary judgment, we apply a two-step inquiry. At the first step, we must determine whether a reasonable jury could find that a constitutional violation occurred. *Thorpe v. Clark*, 37 F.4th 926, 933 (4th Cir. 2022). If no violation could be found, there is no need for immunity and our inquiry comes to an end. As we concluded above, however, whether the Officers violated Case's Eighth Amendment right remains in dispute. Accordingly, we proceed to the second step, which requires us to determine whether the right asserted by Case was

15

clearly established at the time of the alleged violation.[3] *Id.* If the right was not clearly established, then the Officers are entitled to immunity from liability. *Id.*

Our analysis of whether a right is clearly established is guided by decisions of the United States Supreme Court and our own court. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017). Where no such decisions exist, "we may look to a consensus of cases of persuasive authority from other jurisdictions." *Id.* at 538–39 (internal citations and emphasis omitted). A right is "clearly established" if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Cox*, 828 F.3d at 238 (quoting *Henry v. Purnell*, 652 F.3d 524, 534 (4th Cir. 2011) (en banc)). A right need not have been recognized "on identical facts for it to be deemed clearly established." *Quinn v. Zerkle*, 111 F.4th 281, 294 (4th Cir. 2024). Indeed, "our analysis must take into consideration not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." *Cox*, 828 F.3d at 238 (quoting *Odom v. S.C. Dep't of Corr.*, 349 F.3d 765, 773 (4th Cir. 2003) (internal quotation marks omitted)).

The right at issue here was clearly established. *Id.* at 239 (citing *Farmer*, 511 U.S. at 833). This court's decision in *Cox v. Quinn* is on all fours. In *Cox*, the actions of the

---

[3] In certain cases where a violation of the Eighth Amendment is alleged, the two qualified immunity steps collapse into one. This occurs when "deliberate indifference would, if established, necessarily include an awareness of the illegality of the defendant's actions." *Pfaller v. Amonette*, 55 F.4th 436, 448 (4th Cir. 2022). The circumstances in this case, however, arguably call for an assessment of both steps because there is "attenuation between the risk of harm" and whether the Officers' knew that their "conduct [was] constitutionally deficient." *Id.* at 446 (emphasis omitted).

correctional officers exacerbated a known and substantial risk that the plaintiff would be attacked by other incarcerated individuals. *Id.* The plaintiff informed the correctional officers that other men incarcerated in the prison had robbed him and threatened violence. *Id.* at 232, 237. The plaintiff asked the correctional officers to keep his reports confidential because he was concerned that the other men were more likely to attack him if they knew he had complained about them. *Id.* at 233, 237. The correctional officers ignored this request and told the other incarcerated men that the plaintiff had complained. *Id.* at 237, 239. As the plaintiff feared, the men attacked the plaintiff after learning of the complaints. *Id.* This court held that the correctional officers' actions violated the plaintiff's rights under the Eighth Amendment and further concluded that the correctional officers were not entitled to qualified immunity because they had been on notice that their actions violated the constitution. *Id.* at 239.

Similarly here, the Officers were on notice that their actions were likely to increase a known and substantial risk of serious harm of violence by other incarcerated individuals. The Officers' supervisor, Juehrs, had repeatedly admonished the Officers to keep the sallyport doors closed to prevent safekeepers from coming into contact with individuals in the general population. J.A. 39 (memorandum reprimanding officers for repeatedly leaving the sallyport doors open). Yet the Officers aggravated the risk of harm to individuals in the general population—rather than abating it—when they purposefully left the sallyport doors open and then failed to close them even when they learned the safekeepers were returning to Unit 2. In so doing, the Officers failed to fulfill their constitutional obligation to take reasonable action to protect the incarcerated individuals under their watch. "[A]n

17

objectively reasonable correctional officer . . . would have known that [such] actions were unreasonable, ran afoul of clearly established law" and violated the "duty to protect [incarcerated individuals] from a substantial and known risk of harm." *Cox*, 828 F.3d at 239. Thus, like the correctional officers in *Cox* who exacerbated rather than abated a known and substantial risk of harm, the Officers are not entitled to qualified immunity.

The Officers rely on this court's decision in *King v. Riley*, 76 F.4th 259 (4th Cir. 2023), to support their qualified immunity argument. This reliance is misplaced. The facts in *King* differ from the facts in this case in numerous material ways. In *King*, two incarcerated men who were working as janitors for the prison lured a third incarcerated man into an unlocked cell where they strangled him and "stuffed his body underneath the bed." *Id.* at 263. The correctional officer on duty at the time conducted routine security checks in the unit every half hour but did not notice anything amiss until several hours after the attack because he did not look inside each cell during the checks. *Id.* The correctional officer in *King* could not reasonably have been expected to know that the janitors would attack another incarcerated individual or that the victim lay under a bed in a closed cell. *See id.* at 266 n.7. The court in *King* concluded that the correctional officer was entitled to qualified immunity because he had taken substantial action to protect the incarcerated individuals in his care, including the victim. *See id.* at 264–68.

"Qualified immunity fundamentally concerns itself with 'fair notice.'" *Thorpe*, 37 F.4th at 934 (quoting *Hope*, 536 U.S. at 739). That is because "there is no societal interest in protecting those uses of a prison guard's discretion that amount to reckless or callous indifference to the rights and safety of" incarcerated individuals. *Id.* (quoting *Smith v.*

18

*Wade*, 461 U.S. 30, 55 (1983)). The Officers had fair notice that failing to take reasonable action to protect the individuals in the general population from encountering safekeepers would violate the Eighth Amendment.

### C. Extension of Time

Finally, Case argues that the district court abused its discretion when, without applying the relevant standard under Federal Rule of Civil Procedure 6(b), it granted the Officers' motion for extension of time to oppose Case's partial motion for summary judgment against Officer Custodio. We agree.

A court may grant a motion for extension of time that is made after a filing deadline has passed only if the movant "failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). In ruling on the Officers' motion for extension of time, the district court did not consider whether the Officers' prior counsel's conduct constituted "excusable neglect." *Id.* The district court abused its discretion because it failed to apply the requisite legal standard. *Abdelhalim v. Lewis*, 90 F.4th 265, 267, 272 (4th Cir. 2024) (explaining that a district court's failure to apply the correct legal standard constitutes an abuse of discretion).

Accordingly, we vacate the district court's grant of leave to Officer Custodio to oppose Case's motion for partial summary judgment. We remand with instructions to reconsider, this time applying the correct Rule 6(b) standard.

## III. Conclusion

For the reasons set forth above, we vacate the order of the district court granting summary judgment to the Officers, vacate the order granting the Officers' motion for extension of time, and remand with instructions for further proceedings consistent with this opinion.

*VACATED AND REMANDED*
*WITH INSTRUCTIONS*

QUATTLEBAUM, Circuit Judge, dissenting:

I would affirm the district court's order granting the defendants summary judgment based on qualified immunity. "To overcome qualified immunity, a plaintiff must typically show (1) that the government official violated a statutory or constitutional right and (2) that right was clearly established at the time of the challenged conduct." *King v. Riley*, 76 F.4th 259, 265 (4th Cir. 2023). Even if Case has established a genuine issue of material fact on prong one, he has not shown a clearly established right that the challenged conduct violates.

Case insists that he satisfied prong two. He first points to the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994), and argues that, since that decision, "the Supreme Court has been clear that 'prison officials have a duty to protect prisoners from violence at the hands of other prisoners'" under the Eighth Amendment. Op. Br. at 34 (quoting *Farmer*, 511 U.S. at 825). And he argues that, in cases like *Cox v. Quinn*, 828 F.3d 227 (4th Cir. 2016), and *Danser v. Stansberry*, 772 F.3d 340 (4th Cir. 2014), we similarly defined the right at issue as that of a prisoner "to be protected from violence committed by other prisoners." Op. Br. at 34 (quoting *Danser*, 772 F.3d at 346). For its part, the majority largely echoes this approach. While the majority does not overtly say what clearly established right defendants violated, it reasons that this case is factually similar to *Cox* and points out that we found the defendants violated a clearly established right in that case to be free from violence from other prisoners. I am not convinced.

The error in both Case's and the majority's reasoning is that they read the right at issue too broadly. First, under both Supreme Court precedent and our own precedent, the right to be free from violence from other prisoners is too general to be clearly established.

21

Thus, we cannot rely on *Farmer* for identifying the right at issue for purposes of qualified immunity, as Case would have us do. While *Farmer* tells us how a deliberate indifference claim generally works under the Eighth Amendment, it "provides no guidance about how the Eighth Amendment applies to this case's 'specific context.'" *King*, 76 F.4th at 267 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). Rather, the Supreme Court has emphasized repeatedly that, for a right to be clearly established, it must not be defined at a high level of generality. *E.g.*, *City of Escondido v. Emmons*, 586 U.S. 38, 42 (2019); *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). "And while it's true that we require less specificity when defining the right in the Eighth Amendment context than when the Fourth Amendment is implicated, the unlawfulness must still be apparent based on pre-existing law." *King*, 76 F.4th at 266 (cleaned up).

Illustrating this required approach, *King* involved two inmates who murdered several other inmates. *Id.* at 263. While they were committing these murders, a guard was patrolling. *Id.* The guard was trained to do security checks every 30 minutes and to look inside each cell. *Id.* He did the security checks but did not look inside. *Id.* As a result, the undeterred murderers were able to complete their killings. *Id.* In pressing a deliberate indifference claim, a murdered inmate's estate argued that the guard was not entitled to qualified immunity because, though he conducted his security checks, he did not look into each cell. *Id.* at 265. We found that the guard was entitled to qualified immunity because there was no clearly established right "to have a correctional officer look into the cell window while conducting a security check—given a known and substantial risk of inmate-on-inmate violence in the Unit." *Id.* at 266, 268. Note the particularity of the right we

22

required in *King*. Case must define his right with the same degree of particularity. He didn't.

Second, Case's reliance on *Danser* and *Cox* is misplaced. In *Danser*, we said that "[t]he constitutional right at issue [was the] Eighth Amendment right to be protected from violence committed by other prisoners." 772 F.3d at 346 (citing *Farmer*, 511 U.S. at 833–35). But we said that in the context of identifying whether there had been a constitutional violation. *Id.* And because we ultimately found that the plaintiff had not shown a constitutional violation, his claim failed without our even considering whether the right at issue was clearly established. *Id.* at 346–50. Thus, contrary to Case's argument, *Danser* does not give license to define the right so broadly for purposes of the second qualified immunity prong.

And Case's and the majority's reliance on our decision in *Cox* is misplaced for similar reasons. It is true that in *Cox*, we stated that "[i]t has long been established that jail officials have a duty to protect inmates from substantial and known risk of harm, including harm inflicted by other prisoners." *Cox*, 828 F.3d at 239. But right after saying that, we followed with, "[m]oreover, by 2011, we had made it clear that 'a prison official acts with deliberate indifference when he ignores repeated requests from a vulnerable inmate to be separated from a fellow inmate who has issued violent threats which the aggressor will likely carry out in the absence of official intervention.'" *Id.* (quoting *Odom v S.C. Dep't of Corr.*, 349 F.3d 770, 773 (4th Cir. 2003)). Thus, read in its entirety, *Cox* recognizes, consistent with Supreme Court precedent, that a more specific right is needed to be clearly established than the generalized right to be protected from harm by a fellow prisoner.

23

But rather than heeding the Supreme Court's and our admonitions against defining the right at too high a level of generality, Case doubles down. He argues *Cox* tells us it is clearly established that jail officials must protect prisoners from injury from other inmates. And he says we must apply that right here. He even asserts that *King* is inconsistent with our prior precedent and must be ignored.[1] In a sense, I admire Case's boldness. He correctly recognizes that *King* dooms his case. His only option is to urge us to disregard it. But we can't do that. As already explained, *King* does not contradict our precedent. And more importantly, it follows Supreme Court decisions. *Cf. Payne v. Taslimi*, 998 F.3d 648, 653–55, 655 n.4 (4th Cir. 2021) (finding that each panel is generally bound to follow decisions of a prior panel except, *inter alia*, "where subsequent Supreme Court decisions 'clearly undermine[]' a panel precedent" (alteration in original) (quoting *United States v. Williams*, 155 F.3d 418, 421 (4th Cir. 1998))).

Unwilling to go that far, the majority tries a different tack. It contends that the facts of *King* are distinguishable from those here, which are, instead, more like those in *Cox*. Factual similarities or dissimilarities may be relevant to determining whether a prior case

---

[1] In his opening brief, Case argues *King* is distinguishable because, unlike the guard in that case, "[d]efendants made no effort whatsoever to mitigate the substantial risk of harm they created by choosing to leave the sallyport doors open, not even after being alerted to the imminent arrival of safekeepers." Op. Br. at 38. But this characterization is not entirely accurate. The record does not reflect that defendants did nothing in the face of possible danger. For instance, there is no dispute that defendants manned the control booths, even if they did not follow prison policy on when to keep the sallyport doors opened or closed. This is similar to the guard in *King* who did his required patrols, thereby taking steps to mitigate the risk of danger, even if he did not look into each cell, thereby violating prison policy. *See* 76 F.4th at 265–68. When pressed on this at oral argument, Case conceded that he can only prevail if we disregard *King*. Oral Argument at 19:00–20:20.

24

clearly establishes a particular right when we define rights with the appropriate level of generality. But that is not why *King* is relevant for our present purposes. Instead, *King* is relevant because of the legal principle it recognizes—that the right to be free from violence at the hand of other inmates is too broad to be clearly established under the Eighth Amendment. *See* 76 F.4th at 266. And neither Case nor the majority offer any version of the right at issue other than the overly generalized right we rejected in *King*.

If our slate were clean, we could have an interesting debate on how broadly to define the right. But our slate isn't clean. The Supreme Court has told us we must define rights narrowly. *E.g.*, *Emmons*, 586 U.S. at 42 ("This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality." (alteration in original) (quoting *Kisela*, 584 U.S. at 104)); *Mullenix*, 577 U.S. at 12; *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). And it has explained why narrowly defined rights are required. According to the Supreme Court, "qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix*, 577 U.S. at 12 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). As a result, we must provide sufficiently narrow definitions of rights to

provide fair notice of what is required. Because the majority defies this obligation, I

respectfully dissent.[2]

---

[2] The majority also finds that the district court abused its discretion by granting Custodio additional time to oppose Case's motion for partial summary judgment. And it remands with instructions for the district court to reconsider. It is certainly true that the district court had ample grounds for denying Custodio additional time to make this filing. But the district court found that was not appropriate. I would not second guess this decision that lies within the traditional province of the district court's discretion. Beyond that, I am not sure what the majority is remanding for the district court to reconsider. Is the district court supposed to reconsider its denial of Case's motion for summary judgment? If so, could the district court grant summary judgment in Case's favor? I doubt it because the majority found elsewhere that there are genuine issues of material fact that will need to be resolved by a jury. And it is not as if the district court could have granted summary judgment in Case's favor just because Custodio failed to respond if there were genuine issues of material fact in the record. *See Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) ("Although the failure of a party to respond to a summary judgment motion may leave uncontroverted those facts established by the motion, the moving party must still show that the uncontroverted facts entitle[d] the party to 'a judgment as a matter of law.' The failure to respond to the motion does not automatically accomplish this."). Or is the majority saying the district court needs to reconsider whether to grant Custodio additional time to respond? In that case, the remand would be futile because, again, the district court could not now grant summary judgment.